

# NUMBER 13-22-00596-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

KARINA YOHERA FLORES,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

## ON APPEAL FROM THE 24TH DISTRICT COURT
## OF JACKSON COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña**
**Memorandum Opinion by Justice Peña**

Appellant Karina Yohera Flores appeals her conviction for the capital murder of N.F., an individual under ten years of age. *See* TEX. PENAL CODE ANN. § 19.03(a)(8). After a jury returned a guilty verdict, the trial court imposed a term of life imprisonment without the possibility of parole. *See id*. § 12.31(a)(2). In nine issues, which we re-organize, Flores

argues that: (1) the trial court committed various errors related to Flores's requests to have lesser-included offenses included in the jury charge and to discuss punishment with the jury; (2) the trial court erred when it did not permit defense counsel to make an offer of proof by examining a witness; (3) the trial court improperly commented on the weight of the evidence; (4) the State improperly commented on Flores's post-arrest silence during rebuttal closing argument; (5) the trial court erred in allowing the grand jury foreman to testify; and (6) the capital murder statute is unconstitutional. We affirm.

## I.    BACKGROUND

Flores and co-defendant Damien Garza were indicted on multiple counts related to the death of Flores's four-year-old son, N.F., including one count of capital murder. *See id*. § 19.03(a)(8). Count one alleged that on or about February 25, 2021, Flores and Garza, "acting either as a principal or a party," "intentionally and/or knowingly . . . cause[d] the death of an individual, [N.F.]," who "was an individual younger than [ten] years of age" by: (1) "[c]ausing [N.F.] to strike a firm surface"; (2) "[s]triking [N.F.] with the defendant's hand"; (3) "[s]triking [N.F.] with the defendant's foot"; (4) "[s]triking [N.F.] with a hard object"; (4) "[s]triking [N.F.] with an object unknown to the Grand Jury"; and/or (5) "[a]sphyxiating [N.F.] by a means unknown to the Grand Jury."

The State did not seek the death penalty and abandoned all counts except for count one prior to trial. A joint jury trial commenced on October 31, 2022, at which the following evidence was adduced. At around 12:46 a.m. on February 25, 2021, Flores arrived at the emergency room of the Jackson County Hospital in Edna, Texas, holding her son N.F.; Flores appeared "distraught with a child in her hands that looked like [he] was unresponsive." N.F. was not breathing and had no pulse. Emergency room

2

technician Thomas Roznovsky testified that, when N.F. arrived at the hospital, he looked "unkept" and "dirty." After removing N.F.'s clothing, Roznovsky discovered that what he thought was dirt was "actually . . . bruising in different stages, yellows, greens, blacks, brown, purple." Roznovsky also noticed several burn marks on N.F.'s body in different stages of healing and "discolorations around the neck, . . . ligature marks." After removing N.F.'s diaper, Roznovsky identified further bruising and burn marks on the child's buttocks. He said "[t]here were several scars, also, on the abdomen." There were also "cuts and marks on the child. A lot." Roznovsky noted that Flores seemed "distracted" during this time. "She was on the phone the whole time," which Roznovsky found "kind of bizarre."

Dr. Cindy Cedillo-Ruiz (Cedillo) treated N.F. in the emergency room. Dr. Cedillo opined that N.F.'s injuries appeared to be "intentional," and affirmed that they would have been "apparent" to a person of "average observation and intellect, or even someone with diminished abilities." Dr. Cedillo authored a "Physician Clinical Report," which was admitted into evidence. As the report details, when Flores first came into the hospital, she reported that N.F. had thrown a "tantrum." According to Dr. Cedillo, she

> spoke to [Flores] outside trauma room in the presence of [D]eputy [Christopher] Marlow with Jackson County Sheriff['s Office]. [Flores] [r]eports patient had been asleep and she went to check on patient because he had upper respiratory symptoms for past few days, noticed patient had a bladder accident in sleep. [Flores] [r]eports [she] woke up patient, took to restroom, placed in shower and that patient then had tantrum including breath holding and fell in bathtub. [Flores] [t]hen reports [she] initiated CPR at home bathroom. When asked why did she not call 911, mother stated she "didn't know what to do." Reports [she] was driven to [hospital] by a friend.

Marlow was dispatched to the Jackson County Hospital at 1:45 a.m. on the date in

question to investigate potential child abuse. Marlow walked over to Flores and found that "she was just completely indifferent to the situation by her appearance." Flores was involved in a conversation on her cellphone and initially ignored Marlow, which "shocked" and "angered" him. When Flores responded to Marlow, she did so while still on her phone. Because Marlow could hear the other voice on the phone, he noticed that Flores was repeating the information given to her by the other person on the phone.

| [Marlow]: | Yes, sir. It was, again, extremely frustrating. I kept asking her, "How did you get here? How did you get here?" |
| [State]: | And what did she say to that? |
| [Marlow]: | She would just look at me with her cold, lifeless eyes and talk into the phone and say, "They want to know how I got here." And then I heard a male voice on the other end say, "A friend." And then she would answer me. |
| [State]: | And what would she say? |
| [Marlow]: | "A friend." |

Two hours after arriving at the Jackson County Hospital, N.F. was transported to Texas Children's Hospital in Houston. Flores was interviewed there by Chief David Merritt of the Granado Police Department and Texas Ranger John Lingle. This interview was recorded and entered into evidence. When asked what happened with N.F., Flores stated that she has been struggling with potty training N.F., and that he has "tantrums" where he will "fall to the floor, and he will pretend like he's unconscious." According to Flores, on the night in question, N.F. peed himself, had a tantrum and was uncooperative, requiring Flores to "drag him" into the bathroom to clean up, and while she was getting his clothes from another room, "that's when he just, he fell."

4

Although she refused to say at first, Flores eventually stated that Garza is the one who had dropped her off at the hospital. Flores described Garza as a "family friend" and denied being in a relationship with him. Flores would not provide the name of the person she said watched N.F. while she worked. Asked about N.F.'s other injuries, Flores stated that "he's been doing these tantrums where, um, he'll like fall to the floor, and he'll act like, you know he's not responsive and you know like stuff like that." Flores stated that N.F. had been having these tantrums for the past two weeks, and that "[m]ost of these injuries [are] from that. It's from him just, just not wanting to use the restroom." Flores denied knowing anything about burn marks on N.F. and explained that N.F. appeared to have choke marks because he would "act like he's unconscious and he'll like have his head hanging out of the bathtub."

Flores stated that she believed N.F.'s "mental issues" were causing his behavior. She also described him as "spoiled" and "lazy" for his resistance to her attempts to potty train him. At first, Flores admitted only to spanking N.F. with her hand to "discipline him." Later, she admitted that she also used a wooden shower brush, and "just kept hitting him, until [she] realized" what she had done. She admitted to using the wooden brush multiple times, knowing "not to hit him in the same spots." Flores admitted to using the wooden brush as recently as the week before the incident to strike N.F.'s back because he would sink into the toilet during potty training. She then explained that on the night in question, N.F. had peed in the bed and she told him to go the restroom. She said: "As soon as I told him to get up, . . . he starts making a whiny face. I have to drag him to the restroom, force him to go to the restroom. . . . I went and grabbed his clothes," and when she came back, N.F. was lying on his side in the bathtub, non-responsive. After trying to do CPR,

5

she stated "we just drove straight to the hospital."

In a pre-arrest interview on March 3, 2021, which was entered into evidence, Garza admitted to sharing a residence with Flores and N.F. for the past two years. Garza detailed how N.F. had spent most of his life with his maternal grandparents, and that N.F. had only been staying with them for a few months, having moved in around August of 2020. Garza mentioned that the grandparents might have not wanted to care for N.F. any longer because of his "attitude problem," and he opined that N.F. was autistic. Garza stated that he was unemployed and would watch N.F. when Flores would work. Like Flores, when asked to explain N.F.'s injuries, Garza stated that N.F. would have episodes and "hit himself," including sometimes while bathing. Garza stated that for the past three weeks N.F. would have episodes and would "fall to the ground and hit his head," "and that's how he was you know getting all that stuff on the side of his face and stuff."[1] Garza opined that N.F. behaved this way "to get a reaction out of us," and said "that's the way he wanted attention." Garza denied ever disciplining N.F. or hitting him. Garza stated that "he didn't need to" because Flores would discipline N.F. Asked whether he was there on the "night of this last incident," Garza responded "yes." As to why he did not enter the hospital with Flores and N.F., Garza stated that he thought he would not have been allowed inside because of COVID restrictions, and he believed the hospital was closed because of the recent winter freeze.

After several days at Texas Children's Hospital, N.F. died on March 1, 2021. N.F.'s autopsy report listed the manner of death as "homicide." The report notes that "[t]here is

---

[1] Garza's cellphone search history was admitted into evidence. On February 28, 2021, Garza made a search using the following queries: "knocked into a comah [sic]," and "people falling and knocking self out."

evidence of multiple recent blunt force injuries involving the head, neck, torso, and the extremities." These injuries were "consistent with traumatic brain injury with resultant cerebral hypoxic/ischemic neuronal damage." There was also evidence of "remote" blunt force injuries, including "[m]ultiple healed scars involving the head, neck, torso, and the extremities," and "[r]emote fractures . . . on the ribs, second lumbar vertebra, hands, and possibly the sternum." Dr. Rafael Garcia, who performed the autopsy, testified that N.F.'s injuries were "indicative of non[-]accidental injury," and affirmed that the injuries were "intentional." He further narrowed the cause of death to a single instance of blunt force trauma to the head, which caused N.F.'s traumatic brain injury. A report from the State's forensic pathologist notes that N.F.'s injures were consistent with "compression of the chest" and "compression of the spinal column," and that "the hand injuries are consistent with one or more direct impacts to the knuckles." The forensic pathologist testified that some of N.F.'s injuries were weeks or months old.

Dr. Marcella Donaruma, who treated N.F. at Texas Children's Hospital, testified on behalf of the State as to the "kind of forces" that could have caused N.F.'s injuries, and "what manner and means [were] used to inflict injury." Dr. Donaruma testified that N.F.'s injuries were not consistent with self-inflicted injuries, explaining that children "don't bang their heads until they break bones or blood vessels." She also explained that autism or other psychological issues did not help explain his injuries.

Dr. Donaruma testified that, in her opinion, N.F.'s injuries were consistent with "child torture."

> Child torture is child abuse. Child torture is defined by a constellation of circumstances where a child experiences two or more physical assaults or an extended—a single extended physical assault. It is coupled with

psychological maltreatment which could take the form of depredation, rejection, isolation, depravation, terrorizing.

And then in the context of those findings, there's also neglect of medical care needs, basic needs, human needs like clothing and shelter, and the consequences of this constellation of circumstances leads to prolonged suffering, disfigurement or disability, or death.

Dr. Donaruma noted that she had reviewed certain exhibits provided by the State, including photographs which show Garza standing over N.F. with a bowl of food in his hand, with a belt draped around his neck.[2] Dr. Donaruma also viewed a video admitted into evidence, obtained from a search of Garza and Flores's digital devices, in which Garza and Flores can be heard disciplining N.F. In the video, created in September of 2020, N.F. can be seen holding a blue bucket, with his arms shaking.[3] A large dark purple bruise can be seen between his eyes. Garza and Flores can be heard telling N.F. the following:

| [Flores]: | I'm recording him. |
|---|---|
| [Garza]: | That wasn't no spirit[4] that came out of him, that was him throwing up, and he looked at all of us to see if we were going to spank him or do something, and since we didn't, this is what it feels like. You need to cut it out man. |

---

[2] This photograph was also referenced by Lingle in his arrest affidavit. Lingle further noted that a search of the house uncovered the belt in question and black marks along the interior walls of the house. According to Lingle, based on the condition of the belt, the marks on the wall were from the belt.

[3] A similar-looking blue bucket was found during a search of the home. Photographs of the bucket and its contents, which were entered into evidence, show that the bucket contained what appears to be partially digested ramen noodles.

[4] The State introduced into evidence a printed-out document discovered during the search of Garza and Flores's residence. As Lingle explained, this document describes "like an exorcism or something of that nature, like a religious ceremony." This document includes paragraphs like the following: "I exercise this authority on [my child's] behalf to break all curses, spells, evil wishes, evil distress, darkness, magic, hereditary seals, satanic pronouncements, bonds, covenants, dedications, initiations, both known and unknown on her mother's and father's sides all the way back to Adam."

| | |
|---|---|
| [Flores]: | He's making himself do it. |
| [Garza]: | Now you're starting to make yourself throw up. Now you are going to stand there and hold that bucket. Congratulations son. |
| [Flores]: | If you're going to throw up, throw up. Unless you're making yourself do it. Hurry up. |
| [Garza]: | You're just playing sick bro. |
| [Flores]: | You like the camera? |
| [Garza]: | See look at him. He knows he is being recorded, so . . . . |
| [Flores]: | I just showed him and he was all like, is that me? |
| [Garza]: | Is that you? Yeah that is you dude. |
| [Flores]: | Yeah, you are acting like a fool, and you are looking like one. And we don't like that. |
| [Garza]: | I thought you couldn't stand. I thought you couldn't walk. . . . You look healthy right now. |
| [Flores]: | You're standing and throwing up in the bucket. |
| [Garza]: | And you can hold the bucket and stand? You're a good actor. Ain't nothing wrong with you, you're just putting on a show for everybody. . . . Everything you do from now on, we're going to record it. Anytime you don't listen, we're going to record it. Until you heal up and then you can get spanking again. But from now on, this is what we are going to do. We are going to keep a record of everything that you do, that way people can start realizing how bad you are and how much you don't listen, and how for everybody else, you just put on a show and an act. . . . Now you want to spit up and everything. |

As Dr. Donaruma explained, N.F.'s internal injuries would have caused him "pain," "vomiting," and "[h]e would probably have decreased appetite, if any." "He might get

9

dehydrated from the [in]ability to either take in or hold down liquid." Dr. Donaruma stated that "[t]his was child torture." She continued:

> With what I saw, based on the videos you showed me and his body and radiology studies, I believe this was ongoing, and I know it started in that September video at least, and then he died in February. . . . Torture is practiced for the purposes of dominance and control to break somebody, their will. . . . Torture is on purpose, with an agenda. It is cruel. It is dehumanizing.

Dr. Donaruma further explained that a person of average or below average intelligence would have noticed N.F.'s injuries.

At the conclusion of the evidence from both sides, the jury returned a guilty verdict, and the trial court imposed a term of life imprisonment without the possibility of parole.[5] This appeal followed.

## II.    ISSUES RELATED TO PUNISHMENT & LESSER-INCLUDED OFFENSES

In her first four issues, Flores argues that (1) the trial court erred when it notified Flores that no punishment issues would be permitted during voir dire; (2) the trial court erred by preventing Flores from making a jury election on punishment for count one; (3) the "trial court erred by proclaiming and ordering, 'there will be no voir dire on lesser includeds because there are no lesser includeds'"; and (4) the trial court abused its discretion in overruling Flores's objection to the jury charge and her request for instructions on lesser-included offenses. We address the issues together.

### A.    Standard of Review & Applicable Law

We review a trial court's refusal to submit a lesser-included offense instruction for an abuse of discretion. *Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023)

---

[5] Garza was also convicted of capital murder and sentenced to life imprisonment without the possibility of parole. Garza is not a party to this appeal.

(citing *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004)). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or when it acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Therefore, we will uphold a trial court's ruling if it is within the "zone of reasonable disagreement." *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021) (quoting *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)).

"To determine whether a defendant is entitled to an instruction on a lesser-included offense, we apply a two-pronged test." *Wade v. State*, 663 S.W.3d 175, 181 (Tex. Crim. App. 2022) (citing *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007)); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14 (providing that in every felony case, the trial court must "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case"). "First, a reviewing court must determine as a matter of law whether the lesser-included offense is truly a lesser-included offense." *Wade*, 663 S.W.3d at 181 (citing *Hall*, 225 S.W.3d at 535). "Second, there must be some evidence in the record establishing that, if the defendant is guilty, he is guilty of only the lesser offense." *Id.* (citing *Hall*, 225 S.W.3d at 536). "In other words, the evidence must establish that the lesser-included offense provides the jury with a 'valid, rational alternative to the charged offense.'" *Id.* (quoting *Hall*, 225 S.W.3d at 536). This second prong is sometimes referred to as the "guilty-only requirement." *Chavez*, 666 S.W.3d at 776. "[T]he guilty-only requirement is met if there is affirmative evidence of a factual dispute that raises the lesser offense and rebuts or negates other evidence establishing the greater offense." *Id.* (citing *Roy v. State*, 509 S.W.3d 315, 319 (Tex. Crim. App. 2017)). "It does not matter if the factual dispute is

11

based on direct or circumstantial evidence so long as a rational jury could interpret the record in a way in which it could find the defendant guilty of only the lesser-included offense." *Id*.

"Regardless of the strength or weakness of the evidence, if more than a scintilla of evidence, from any source, raises the issue that the defendant was guilty only of the lesser offense, then the defendant is entitled to an instruction on the lesser offense." *Wade*, 663 S.W.3d at 181 (citations omitted). "We consider all the evidence admitted at trial," and "a defendant's testimony alone may be sufficient to raise the issue." *Id*. (citations omitted). For this analysis, "we view the facts in the light most favorable toward submitting the instruction, not in a light most favorable to the verdict," and "we evaluate the evidence in the context of the entire record, but do not consider whether the evidence is credible, controverted, or in conflict with other evidence." *Id*. (citations omitted). However, "if the defendant presents evidence that he committed no offense at all or if he presents no evidence, and there is no evidence otherwise raising the issue, a charge on a lesser offense is not required." *Chavez*, 666 S.W.3d at 777 (cleaned up) (citations omitted).

Lastly, the Texas Court of Criminal Appeals has noted that when requesting lesser-included offense instructions, "general or insufficiently specific objections do not preserve error for appeal." *Williams v. State*, 662 S.W.3d 452, 462 (Tex. Crim. App. 2021) (citations omitted).

> A defendant who files or dictates a laundry-list of objections to the charge must also specify the legal or factual reasons why he believes himself entitled to such special instructions. This requirement alerts the trial court, and the opposing party, of what strategic jury instructions the party wants and why he is entitled to them. Again though, under Rule 33.1, if the grounds for the instruction are obvious to the court and opposing counsel, then error is preserved for appeal. Thus, the trial judge errs only when he refuses to

submit an instruction on an actual lesser included when (1) such specific evidence is manifest, or (2) the defendant points to the specific evidence that negates the greater offense but supports the lesser offense.

*Id*. (citations omitted).

## B.    Discussion

In the trial court, Flores specifically requested instructions on the following lesser-included offenses: injury to a child, manslaughter, aggravated assault causing serious bodily injury, and criminally negligent homicide. On appeal, Flores also argues that a lesser-included instruction for felony murder would have been appropriate. As to felony murder, Flores did not ask for this instruction in the trial court and thus has failed to preserve error as to this lesser-included offense. *See Paz v. State*, 44 S.W.3d 98, 100 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("Appellant did not request that the jury be charged on criminally negligent homicide at trial. As a result, appellant did not preserve error for our review on criminally negligent homicide, and we will not consider appellant's point of error with respect to that issue.").

As to the remaining lesser-included offenses, during trial, defense counsel broadly argued that the "evidence showed that [if Flores] was guilty of anything, [she was] guilty of only an unintentional killing or reckless killing, not intentional or knowingly." Defense counsel then made specific requests as to each lesser-included offense. First, defense counsel argued that "evidence has been presented which is subject to different interpretations. Specifically, I am asking for the lesser included of injury to a child, serious bodily injury being included because the cause of death has been subject to different interpretations on the record." As to manslaughter, defense counsel argued that Flores "in her statement, admitted to striking [N.F.] for discipline, so then she did this then and

13

there recklessly causing the death, when she was aware, but consciously disregards a risk that death will occur." Defense counsel separately urged an instruction for aggravated assault causing serious bodily injury. At this point, the trial court interjected and asked defense counsel "[w]hat evidence has been admitted to negate the higher offense?" Defense counsel responded as follows:

[Defense Counsel]:    Serious bodily injury was caused, but [Flores], acting alone or even as a party, did not intend death.

Evidence presented: When she's giving her statement, striking the child, let's say, causing serious bodily injury. The child dies five days later at the hospital.

Death wasn't intended, but it would have been an aggravated assault [causing] serious bodily injury. Intervening causes in the middle.

Defense counsel then requested an instruction for criminally negligent homicide. Defense counsel's only statement in support of this instruction was as follows: "An unintentional killing by complete disregard or [in]difference for human life. No intent to cause death; that has been brought up. The nurses testified to reckless failing to do anything, but not wanting for the child to die." The trial court denied each one of defense counsel's requests, overruling her objections to the jury charge.

As to Flores's admission that she struck N.F., the record does not support defense counsel's contention that Flores's statement about disciplining N.F. was evidence of an "unintentional killing or reckless killing." Flores never admitted to striking or hitting N.F. on the night in question, as defense counsel seemed to suggest when arguing that Flores may have struck N.F. with the intent to cause serious bodily injury only. Although Flores

14

admitted to hitting N.F. with her hand and the wooden shower brush on prior occasions, as recently as a week before, she denied hitting or striking him on that night. According to Flores, on the night in question N.F. peed himself and after he refused to go the restroom, Flores had to "drag" an uncooperative N.F. "to the restroom, force him to go to the restroom." Flores then left N.F., who was "stumbl[ing]" and "fall[ing]," alone in the bathtub as she went to get his clothes and returned to N.F. non-responsive in the bathtub.

Because Flores never admitted to hitting or striking N.F. on the night he became non-responsive, defense counsel's re-characterization of the evidence did not provide the trial court any "affirmative evidence of a factual dispute that raises the lesser offense and rebuts or negates other evidence establishing the greater offense." *Chavez*, 666 S.W.3d at 776. Defense counsel's suggestion that Flores's admission to striking N.F. on prior occasions to discipline him constituted evidence supporting her striking him on the night in question with a lesser state of mind is speculative and does not constitute any affirmative evidence negating one of the elements of capital murder. See *Cavazos v. State,* 382 S.W.3d 377, 385 (Tex. Crim. App. 2012) (noting that satisfying the guilty-only requirement "*requires more than mere speculation*—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." (emphasis added)). Rather, here, Flores "present[ed] evidence that [s]he committed . . . no offense at all," which does not require a charge on a lesser-included offense. *Id*. at 777. Because there was no evidence otherwise showing or indicating that Flores may have struck N.F. on the night in question with a lesser state of mind, the trial court did not abuse its discretion in denying lesser-included offense instructions based on Flores's admission to "striking" N.F; at the most, the decision was within the zone of

15

reasonable disagreement. *See id*.; *Inthalangsy*, 634 S.W.3d at 754.

As to defense counsel's statement that "the cause of death has been subject to different interpretations on the record," we find that defense counsel's statement was too general and insufficiently specific to preserve error for appeal. *See Williams*, 662 S.W.3d at 462. Defense counsel failed to inform the trial court which testimonial or documentary evidence provided "different interpretations" as to the cause of death. In fact, the record suggests just the opposite. Dr. Cedillo, Dr. Garcia, and Dr. Donaruma all opined that N.F.'s injuries were either "intentional" or "non[-]accidental," with Dr. Donaruma stating that N.F. was the victim of child torture, which is done "on purpose, with an agenda."

In *Williams*, appellant was charged with continuous trafficking of persons, and requested "a jury instruction on the lesser-included offense of human trafficking of persons[.]" 662 S.W.3d at 455. Before the request for a lesser-included offense instruction, "the trial court heard [a]ppellant testify in his defense and deny that he committed any offense at all." *Id*. at 463. The record suggested that an off-the-record charge conference took place, but when pointing to the facts in support of the lesser-included offense, the only statement provided by defense counsel was that he "believe[d] there was in substance" evidence satisfying the guilty-only requirement. *Id*. In ruling against appellant, the *Williams* court concluded,

> Appellant argues that his complete denial of the offense of trafficking does not, as the State would have it, automatically bar him from receiving a lesser-included offense instruction. But we are not addressing whether the instruction is warranted by evidence at trial. We are addressing, in the first instance, whether the grounds for the request would have been obvious to the trial court so that any error in failing to give the instruction was preserved for appeal. And they would not have been so here. The trial court asked whether there was evidence that negated the greater offense. Counsel's response, 'I believe there was in substance[,]' failed to direct the trial court

16

to specific evidence justifying the jury instruction. And, as the trial court started to ask another question, counsel cut the court off, saying, 'Okay. And then, the Court makes the ruling. It is what it is.' Because the evidence supporting trafficking as a rational alternative to the charged offense was not obvious, and [a]ppellant failed to point to it, the trial court, reversed on appeal, was classically 'sand-bagged.' The reason the contemporaneous objection rule exists is to give the trial judge an opportunity to make a given ruling and to get it right.

*Id.* at 463–64 (alterations in original).

Likewise, here, we conclude that defense counsel's general and non-specific statement that "the cause of death has been subject to different interpretations on the record," did not provide the trial court with "specific evidence that negates the greater offense but supports the lesser offense," especially considering the overwhelming testimonial and documentary evidence supporting an intentional and non-accidental killing. *See id*. at 462. Further, given the fact that Flores denied hitting or striking N.F. on the night in question, as in *Williams*, the specific grounds for the requested lesser-included offenses would not have been apparent to the trial court. *See* 662 S.W.3d at 463 (faulting court of appeals for concluding that a lesser-included offense instruction was required because the court relied on facts not provided by defense counsel in urging its motion for a lesser-included offense and noting that "[n]one of this specific evidence was manifest because the defensive theory was that he did not commit any crime").[6]

---

[6] In her brief, Flores points to a list of facts which she argues support any one of her proposed lesser-included offense instructions. For example, Flores points to the fact that she brought N.F. to the hospital, she looked distraught when entering the hospital, she was screaming for help when she entered the hospital, she attempted to perform CPR on N.F., and she did not attempt to conceal N.F.'s body. However, defense counsel pointed to none of these facts when urging its lesser-included offense instructions, and these specific facts were in no way manifest from the context of defense counsel's argument. See *Williams v. State*, 662 S.W.3d 452, 462 (Tex. Crim. App. 2021). Accordingly, Flores did not preserve error as to those factual bases and we cannot conclude that the trial court committed error based on them. *Id*.

17

Lastly, in support of an instruction on criminally negligent homicide, defense counsel argued that the evidence showed "[n]o intent to cause death," and asserted that the "nurse testified to reckless failing to do anything, but not wanting for the child to die." However, any statement made to a nurse after N.F. was admitted to the hospital, absent any other evidence evincing a lesser state of mind, does not show that Flores had a lesser state of mind at the time she inflicted the injury, either as a principal or party, that caused N.F.'s death.

In *Cavazos*, appellant was charged with murder and requested manslaughter as a lesser-included offense. 382 S.W.3d at 384. Appellant was accused of shooting the victim, and when requesting the manslaughter instruction, the only evidence that appellant pointed to was a witness' testimony that after the shooting, appellant "told her that he did not mean to shoot anyone." *Id*. at 385. The Texas Court of Criminal Appeals rejected appellant's argument, reasoning that

> There was no evidence directly germane to recklessness. Pulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend "I didn't mean to shoot anyone" does not rationally support an inference that Appellant acted recklessly at the moment he fired the shots. The evidence here does not support a finding of recklessness and does not rise to level that would convince a rational jury to find that if Appellant is guilty, he is guilty of only the lesser-included offense. Without additional evidence supporting a finding of recklessness, Salais's testimony alone is insufficient to require an instruction on the lesser-included offense of manslaughter. Because the facts did not raise manslaughter as a valid, rational alternative to the charged offense, [a]ppellant was not entitled to the requested jury instruction.

*Id*. at 385–86.

We find the reasoning of *Cavazos* applicable here. Here, there was no evidence "directly germane" to a lesser state of mind. *See id*. at 385. Given the other facts and

18

circumstances of the case, including Flores's denial of hitting or striking N.F. on the night in question and her acts evincing consciousness of guilt, her statements to a nurse once N.F. was already in the hospital do not "rationally support an inference" that Flores acted with a lesser state of mind "at the moment" that N.F.'s fatal injuries were caused. *See id*. Flores has failed to show that this evidence satisfies the guilty-only requirement, and, at most, the trial court's decision was within the zone of reasonable disagreement. *See id*.; *Inthalangsy*, 634 S.W.3d at 754.

Having reviewed the evidence in support of Flores's proposed lesser-include offense instructions, we have concluded that the evidence referred to by Flores either does not satisfy the guilty-only requirement as to any of the proposed lesser-included offenses, *see Chavez*, 666 S.W.3d at 776, or that defense counsel's objections to the jury charge were so general as to fail to preserve error. *See Williams*, 662 S.W.3d at 462. Accordingly, we overrule Flores's fourth issue.

Having found no error in the trial court's rejection of Flores's requested lesser-included offense instructions, we need not address the merits of Flores's remaining claims as to punishment. The capital murder statute imposes a mandatory sentence of life imprisonment without parole where, as here, the State does not seek the death penalty. *See* TEX. PENAL CODE ANN. § 12.31. Therefore, any alleged errors by the trial court related to punishment could not have possibly contributed to Flores's conviction or punishment. *See, e.g.*, *Dowthitt v. State*, 931 S.W.2d 244, 251 (Tex. Crim. App. 1996) ("Because appellant was convicted of capital murder, any erroneous or misleading hypotheticals to prospective jurors about punishment for the lesser-included offense of murder made no contribution to appellant's conviction or punishment," and "[w]e need not address the

19

merits of this allegation because any error would be harmless."). We overrule Flores's first and second issues.

As to Flores's third issue, according to which the trial court erred in preventing her from asking questions regarding lesser-included offenses during voir dire, we conclude that she failed to preserve error. This case is substantially similar to *Mohammed v. State*, in which the appellant was charged with capital murder and requested to ask prospective jurors questions "on the lesser included offenses of felony murder, kidnapping, and robbery." 127 S.W.3d 163, 169 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). The court of appeals continued,

> Appellant notes that the trial court denied questioning about the lesser-included offenses, as well as the punishment for them, on the basis that no evidence would be presented raising the lesser-included offenses. Appellant claims that, when, as here, the evidence raises the lesser-included offenses, restriction of voir dire questioning concerning them constitutes reversible error.

*Id*.

The *Mohammed* court found that appellant had failed to preserve error because he did not propose "particular, proper questions" to the trial court. *Id*. (citing *Sells v. State*, 121 S.W.3d 748, 754–57 (Tex.Crim.App.2003)). The court of appeals reasoned,

> The Court of Criminal Appeals [has] held that, to preserve error, an appellant must show that he was prevented from asking *particular* questions that were proper. That the trial court generally disapproved of an area of inquiry from which proper questions could have been formulated is not enough because the trial court might have allowed the proper question had it been submitted for the court's consideration. Because appellant did not show that he was prevented from asking a particular, proper question, he failed to preserve error for review.

*Id*. (cleaned up).

The reasoning in *Mohammed* applies to this case. *See id*. In particular, we note that Flores filed an objection to the trial court's voir dire restrictions, but did not provide or propose any particular, proper questions to the trial court. Further, defense counsel did not provide or propose any particular, proper questions when presenting argument on this issue before voir dire. Accordingly, we conclude that Flores failed to preserve error. *Id*. We overrule Flores's third issue.

### III. OFFER OF PROOF

By her fifth issue, Flores argues that the trial court "refused to permit any offer of proof and challenged [her] to go the appeals court for relief." On cross-examination of Dr. Cedillo, defense counsel asked if she had training with battered women and if she could describe "some characteristics of a battered woman." The State objected on relevancy grounds, and the trial court sustained the objection. Later, after Dr. Cedillo had completed her testimony, defense counsel asked to make an "offer of proof" as to the line of questioning previously prohibited. The trial court denied this request, noting that it "would have to have the witness come back so that you could ask those questions." The trial court also told defense counsel to "[p]ut anything you want on the record."

### A. Standard of Review & Applicable Law

In order to preserve error regarding a trial court's decision to exclude evidence, the complaining party must comply with Texas Rule of Evidence 103 by making an "offer of proof" which sets forth the substance of the proffered evidence. TEX. R. EVID. 103(a)(2) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the

21

context."). "The offer of proof may consist of a concise statement by counsel, or it may be in question-and-answer form." *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009) (citing *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998)). "If in the form of a statement, the proffer 'must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible.'" *Id.* at 889–90 (quoting *Warner*, 969 S.W.2d at 2). "An offer of proof needs to show the facts that a defendant wishes to prove; if it does not do so, the issue is not preserved for appellate review." *Railsback v. State*, 95 S.W.3d 473, 478 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (citation omitted).

A party has an absolute right to make an offer of proof. *See Kipp v. State*, 876 S.W.2d 330, 333 (Tex. Crim. App. 1994). Where an appellant is precluded from making an offer of proof, we ordinarily must "abate the appeal and remand to the trial court for a hearing so that appellant can . . . properly perfect the record." *Spence v. State*, 758 S.W.2d 597, 599–600 (Tex. Crim. App. 1988) (citations omitted). However, such an error is harmless if the appellant does not raise a point of error on appeal predicated on the excluded evidence. *See Andrade v. State*, 246 S.W.3d 217, 227 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) ("[A]s appellant has not raised an issue in this appeal arguing the trial court erred in excluding Detective Avila's testimony, an abatement to permit counsel to develop the appellate record would serve no purpose as it would not result in the development of any information relevant to this appeal." (citing *Rivera v. State*, 981 S.W.2d 336, 341 (Tex. App.—Houston [14th Dist.] 1998, no pet.))).

22

**B. Discussion**

The record shows that the trial court explicitly told defense counsel to "[p]ut anything you want on the record." Accordingly, defense counsel was allowed to make an offer of proof by making a concise statement on the record. *See Mays*, 285 S.W.3d at 889. Regardless, setting this fact aside, any error in precluding defense counsel's offer of proof was harmless because Flores does not argue on appeal that the trial court erred in excluding Dr. Cedillo's testimony about battered woman syndrome. *See Andrade*, 246 S.W.3d at 227. We overrule Flores's fifth issue.

## IV. IMPROPER JUDICIAL COMMENT

By her sixth issue, Flores argues that the trial court erred by improperly commenting on the weight of the evidence. In particular, Flores complains that during the testimony of Dr. Garcia about N.F.'s autopsy, the trial court stated: "Doctor don't feel that you have to pare down. If something you're doing or seeing has some application to this autopsy, go ahead and explain everything because I want—a visual picture is worth a thousand words."

**A. Standard of Review & Applicable Law**

"Due process requires a neutral and detached hearing body or officer." *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)). "Absent a clear showing of bias, a trial court's actions will be presumed to have been correct." *Id*. "In his discretion, a judge may lawfully provide guidance and manage the presentation of evidence without abandoning his role as a neutral and independent arbiter." *Barron v. State*, 630 S.W.3d 392, 408 (Tex. App.—Eastland 2021,

23

pet. ref'd) (citing *Strong v. State*, 138 S.W.3d 546, 552 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.)).

A judge shall not, "at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case." TEX. CODE CRIM. PROC. ANN. art. 38.05; *see Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (holding that a trial judge must refrain from making any remark calculated to convey his opinion of the case because jurors give special and peculiar weight to the language and conduct of the trial judge). By creating "a duty on the trial court . . . to refrain sua sponte from a certain kind of action," article 38.05 provides the defendant with a right to be tried in a proceeding devoid of improper judicial commentary. *See Proenza v. State*, 541 S.W.3d 786, 798–801 (Tex. Crim. App. 2017). "The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case." *Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Generally, the violation of a statutory provision amounts to no more than non-constitutional error and "must be disregarded" unless the error affects the substantial rights of the accused. TEX. R. APP. P. 44.2(b). A defendant's substantial rights are affected if the erroneous admission of evidence had a "substantial and injurious effect or influence" on the jury's verdict. *Cook*, 665 S.W.3d at 599. A defendant's substantial rights are not affected by trial court error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

24

When we assess the likelihood that an error adversely influenced the jury, we consider the entire record, including (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating the defendant's guilt, and (4) whether the State emphasized the complained-of error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Motilla*, 78 S.W.3d at 356–58.

## B. Discussion

Flores has not shown any bias on the part of the trial court in making the complained-of comment and has failed to rebut the presumption that the trial court acted properly. *See Brumit*, 206 S.W.3d at 645. Here, the trial court's comments merely "provide[d] guidance" to the witness and helped to "manage the presentation of evidence," a permissible and necessary role of the trial court. *See Barron*, 630 S.W.3d at 408.

Further, Flores does not argue or otherwise articulate how this comment by the trial court resulted in a "substantial and injurious effect or influence" on the jury's verdict. *See Cook*, 665 S.W.3d at 599. For example, in *Proenza v. State*, we found reversible error based on improper judicial comments where the appellant complained that the "trial court's questioning of [an expert witness] for almost ten pages of the record served to discredit his defensive theory, rebut his presumption of innocence, and sway the jury's verdict." 555 S.W.3d 389, 399 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.). After an extensive review of the record, we concluded that:

> The subject of the extended exchange between the trial court and the State's witness related directly to a defensive theory. The court conveyed its opinion to the jury regarding one of the main issues of the case—whether

25

Proenza's failure to seek medical care for A.J.V. caused the child to suffer injury. This, combined with the character of the judicial error; its effect on Proenza's defense to the failure-to-seek-medical-care theory of the case; the court's voir dire explanation that the case involved the death of a child, a death that was caused by omissions that included failure to seek medical care; arguments by both sides that emphasized the two theories of omission as well as Proenza's defensive theory; and the evidence before the jury that was not overwhelming on the matter of medical-care consent, leads us to conclude that the comments by the trial court more than slightly influenced the verdict.

*Id.* at 404–05.

Reviewing the record as a whole, we cannot conclude that the complained-of comment here had such a "substantial and injurious effect or influence" on the jury's verdict sufficient to warrant reversal. *See Cook*, 665 S.W.3d at 599. Considering the limited nature of the comment, together with the nature and degree of the evidence supporting conviction, we cannot say that the complained-of comment had any more than a slight effect on the jury's verdict, if any. *See Gonzalez*, 544 S.W.3d at 373; *Motilla*, 78 S.W.3d at 355. Therefore, even if we found the trial court's remark to be an improper comment on the weight of the evidence, the error would not be reversible. *See* TEX. R. APP. P. 44.2(b). We overrule Flores's sixth issue.

## V.    FIFTH AMENDMENT VIOLATION

By her seventh issue, Flores argues that the State improperly commented on Flores's post-arrest silence when, during rebuttal closing argument, the prosecutor stated as follows: "How many people came up and said, [t]his I saw happen, under oath, subject to perjury? Something that would give it more meat, more credibility subject to cross-examination. You don't have that." This statement followed defense counsel's argument in closing that Flores "could not escape" Garza, and that she was abused and controlled

26

by Garza.

**A.    Standard of Review & Applicable Law**

Proper prosecutorial argument should generally fall within one of the following categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement. *Brown v. State*, 270 S.W.3d 564, 571 (Tex. Crim. App. 2006); *Cantu v. State*, 944 S.W.2d 669, 671 (Tex. App.—Corpus Christi–Edinburg 1997, pet. ref'd). "In examining challenges to jury argument, the Court considers the remark in the context in which it appears. Counsel is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith." *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

"When a prosecutorial remark impinges upon an appellant's privilege against self-incrimination under the constitution of Texas or of the United States, it is error of constitutional magnitude." *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011). "The comment must clearly refer to the accused's failure to testify, and it is not sufficient if it might be construed as an implied or indirect allusion." *Canales v. State*, 98 S.W.3d 690, 695 (Tex. Crim. App. 2003) (cleaned up) (citations omitted). "The test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Id*.

**B.    Discussion**

Here, the complained-of statement was directly responsive to defense counsel's argument that Flores was controlled by Garza and that others were "apprehensive and

scared of him." The entire statement in context is as follows:

> Controlled by [Garza]. Yeah, there's some [evidence]. Does that explain it? Does that excuse it? She said she'd bring some [evidence]. There is some, okay. But I want you to know that all of this is from what? Third parties, might have heard, okay. Here is the thing. How many people came up and said, [t]his I saw happen, under oath, subject to perjury? Something that would give it more meat, more credibility subject to cross-examination. You don't have that.

In its proper context, the State's comment was a permissible answer to argument of opposing counsel. *See Brown*, 270 S.W.3d at 571. The State was arguing that, although Flores could point to some "third party" witness testimony to support the inference that Garza controlled Flores, none of those witnesses testified to personally observing instances of controlling or abusive behavior.[7] The State did not "clearly refer to [Flores]'s failure to testify," and given the context of the statement, we cannot conclude that "the jury would necessarily and naturally take [the complained-of statement] as a comment on [Flores]'s failure to testify." *Canales*, 98 S.W.3d at 695. Accordingly, we overrule Flores's seventh issue.

## VI.   ADMISSION OF GRAND JURY FOREMAN TESTIMONY

In her eighth issue, Flores argues that the trial court erred in permitting the grand jury foreman to testify. The State called Rodney Roberson, the grand jury foreman, to testify in support of the State's contention that the manner and means of committing the offense were unknown to the grand jury. On appeal, Flores argues that this testimony violated the rules pertaining to the secrecy of grand jury proceedings. *See* TEX. CODE

---

[7] When defense counsel argued that Garza controlled Flores and that she could not escape him, the State objected, and the trial court in a bench conference asked defense counsel what evidence in the record supported her claim that Flores "couldn't escape," to which defense counsel responded as follows: "So the family—and we've given examples in which they said every time she would try to leave, he would go get her."

CRIM. PROC. ANN. arts. 20A.202, 20A.203.

## A.    Standard of Review & Applicable Law

We review the challenge to the admission of evidence under an abuse of discretion standard. *Montgomery v.* State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or when it acts arbitrarily or unreasonably. *Rhomer*, 569 S.W.3d at 669. Therefore, we will uphold a trial court's ruling on admissibility if it is within the "zone of reasonable disagreement." *Inthalangsy*, 634 S.W.3d at 754. The trial court's erroneous admission of evidence generally constitutes non-constitutional error. *Gonzalez*, 544 S.W.3d at 373. As such, we must disregard the error unless it affected an appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b).

## B.    Discussion

Aside from Flores's bare assertion of "fundamental error," she does not state how Roberson's testimony in any way influenced the jury's verdict. Given the limited nature of Roberson's testimony, the nature and degree of the evidence supporting the verdict, and the failure of Flores to cite any portions of the record wherein the State emphasized the complained-of error, we cannot conclude that Roberson's testimony had a "substantial and injurious effect or influence" on the jury's verdict. *Cook*, 665 S.W.3d at 599. Thus, any error in admitting such testimony must be disregarded. *Gonzalez*, 544 S.W.3d at 373; TEX. R. APP. P. 44.2(b). We overrule Flores's eighth issue.

### VII.    CONSTITUTIONALITY OF CAPITAL MURDER STATUTE

By her ninth issue, Flores argues that the capital murder statute under which she was convicted "is unconstitutional on its face and a violation of the mandate of *Furman v.*

*Georgia*, 408 U.S. 238 (1972)," because the imposition of a life sentence without the possibility of parole constitutes cruel and unusual punishment. The United States Supreme Court and the Texas Court of Criminal Appeals have rejected such arguments and have held that a mandatory life sentence without parole does not violate the Eighth Amendment. *See Harmelin v. Michigan*, 501 U.S. 957, 994–96 (1991); *Avalos v. State*, 635 S.W.3d 660, 672 (Tex. Crim. App. 2021) (applying *Harmelin* and holding that a mandatory life sentence without parole imposed on an intellectually disabled person does not violate the Eighth Amendment). Consequently, Flores's claim is without merit. *See Ervin v. State*, 331 S.W.3d 49, 53 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("As an intermediate court of appeals, we are bound to follow the precedent of the court of criminal appeals."). We overrule Flores's ninth issue.

## VIII. CONCLUSION

We affirm the trial court's judgment.

L. ARON PEÑA JR.
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
5th day of December, 2024.